AXEL E. JOHNSON, *Appellee,* v. THE KANSAS NATURAL GAS COMPANY, *Appellant,* and SELMA A. JOHNSON et al., *Appellees.*

No. 18,411.

SYLLABUS BY THE COURT.

1. ACTION — *Accounting — Product of Gas Wells — Measure of Damages.* In an action for an accounting by a tenant in common of lands from which the defendant had taken the product of six producing gas wells for a period of several years and had sold the same, marketing it through pipe lines to which other wells belonging to the defendant were connected, the measure of damages is the fair and reasonable value of the gas at the time and place at which it was taken.

2. ———— *Burden of Proving Allowances for Expenses on Defendant.* In the case stated, the plaintiff is entitled to recover the amount the gas sold for, less the fair and reasonable expense of marketing; the rule in suits for accounting generally obtains, and the defendant has the burden of proving what allowances he is entitled to.

3. ———— *Findings Based in Part on the Trial Court's General Information and Knowledge of Local Conditions Upheld.* Where in such a case the defendant fails to produce proof showing the approximate quantity of gas taken, or the net price it sold for, or evidence showing the reasonable rental value of the pipe lines, and there is a wide variance in the testimony of the witnesses and the claims of the parties, estimates of the quantity taken and the fair and reasonable expense of transporting the same to market, made by the trial court upon a consideration of all the evidence as well as upon the court's general information and knowledge of the history and conditions of the gas field where the wells are located, will be upheld.

4. ———— *Improper Charges by the Gas Company.* In the case stated, the defendant, the Kansas Natural Gas Company, owned a large interest in the stock and securities of the pipe lines through which the gas in question, together with the product of many other gas wells, was transported to market. *Held,* that the plaintiff can not be charged with the burden of paying any part of the sums expended in the purchase of the stock and securities of the underlying companies, or in sinking funds to redeem bonds issued in payment of the original cost of the construction of the pipe lines, or for drilling

new wells for the defendant; and further, that the fair and reasonable rental value of the use of the pipe lines for transporting gas can not, in a case like this, be established by proof of such payments.

5. FINDINGS—*Supported by the Evidence.* In this case it is held, that none of the findings appears to be so contrary to any well known physical facts as to require another trial, or to abrogate the established rule that the findings of the trial court made upon conflicting oral evidence are conclusive.

Appeal from Wilson district court; JAMES W. FINLEY, judge. Opinion filed October 11, 1913. Affirmed.

*Eugene Mackey,* of Pittsburg, Pa., and *John J. Jones,* of Chanute, for the appellant.

*R. B. Smith,* and *C. M. Brobst,* both of Chanute, for appellee Axel E. Johnson; *T. J. O'Donnell,* of Denver, Colo., of counsel.

*James M. Kennedy,* of Fredonia, for appellees Selma A. Johnson *et al.*

The opinion of the court was delivered by

PORTER, J.: Action in the nature of one for an accounting between tenants in common.

The court made findings of fact and conclusions of law which are summarized as follows: In December, 1904, John A. Johnson died intestate, seized in fee of the southwest quarter of section 33, township 27, range 17, Wilson county. There has been no administration of his estate. He left surviving him his widow, Selma Johnson, and six children, including Axel E. Johnson, the plaintiff. On January 5, 1906, the widow and all the heirs except Axel E. Johnson joined in executing to the Kansas Natural Gas Company an oil and gas lease on the premises, by virtue of which the company entered upon the land and drilled six gas wells and began taking gas therefrom. The plaintiff, Axel E. Johnson, left his father's home in 1889 and was not heard from by any member of the

family from about 1898 until the summer of 1910, during which time his whereabouts or whether he was living or dead was unknown. In the summer of 1910 he returned, and learning of the gas being taken from the land, made a demand of the defendant gas company for one-twelfth of the sum received from the sale of the gas taken. The demand was refused, and on November 28, 1910, this action was commenced. The plaintiff is the same Axel E. Johnson who left his home in 1889, and is the son and heir of John A. Johnson, deceased. The consideration paid for the oil and gas lease referred to was one dollar; the lease was made without the knowledge or consent of the plaintiff, Axel E. Johnson. Prior to April 1, 1912, the Kansas Natural Gas Company had taken from the wells on the premises referred to 4,570,604,000 cubic feet of gas, at the standard pressure of 4 ounces, and had sold the same, receiving therefor $0.1204 per thousand cubic feet, at the standard pressure of 4 ounces. The company expended $1500 in drilling each of the six wells located on the premises. Axel E. Johnson's share of this expense is $750. The profits of the defendant derived from the sale of the gas from the Johnson lease are far in excess of the consideration paid for the lease.

The court found that there is due the plaintiff for his share of the gas taken from the premises the sum of $45,108.47. Upon request of the defendant, Kansas Natural Gas Company, the following additional findings of fact were made:

### 18.

"Plaintiff did not expressly waive any claim he might have under the theory of wrongful confusion of goods, but his counsel in substance stated in open court that if the quantity of gas taken could be ascertained, in his judgment, the harsh rule of confusion of goods should not be applied.

### 19.

"After establishing his interest in the land in question, the plaintiff offered evidence tending to show the quantity of gas taken and the proceeds derived from the sale of it.

### 20.

"The pipe line rental of $3,810,118.07 was for the Kansas City 16″ line, and included no other part of the system of pipe lines and pumping stations.

### 21.

"Six per cent interest on the money invested in said other northern lines and compressor stations, for the time used while gas was taken from said land, equals $1,140,558.75.

### 22.

"The depreciation of the said other northern lines and compressor stations for the period used, while gas was taken from said land, equals $950,463.70.

### 23.

"Mr. LaDow's computations on the quantity of gas taken up to the time minute pressure readings were begun as shown by the evidence, are based upon initial open flow capacity of wells.

### 24.

"In his figures, based upon minute pressure readings, Mr. LaDow used the total minute pressure for his basis of computation."

As conclusions of law, the court held that the plaintiff since his father's death has been the owner of an undivided one-twelfth interest in the land in question and is entitled to judgment against the gas company for the sum of $45,108.47. Judgment was rendered accordingly, from which the company has appealed.

The first errors complained of may be disposed of summarily. The petition stated a cause of action, and the objection to the admission of evidence under it was rightly overruled. If it were conceded, as the defendant company claims, that no evidence was offered tend-

ing to show that it had any notice or knowledge of plaintiff's interest in the lands, and therefore that plaintiff was required to make some showing of the quantity and reasonable value of the gas taken, we think beyond any question that plaintiff produced sufficient evidence to make a *prima facie* case.

The whole controversy was over the facts, which involve the quantity of gas taken from the Johnson wells, the cost of marketing the same, and the net price that should be charged against the gas company for the plaintiff's share. The trial was a lengthy one, and the evidence voluminous and conflicting. The record contains exhibits from "A" to "W" which were offered in evidence, and innumerable references to technical books and to reports produced by the defendant gas company showing the volume and some of the details of a business that during the years from 1904 to 1912 reached such magnitude that more than thirteen millions of dollars was received from the sale of gas through the two pipe lines alone to which the Johnson wells were connected. There was a great deal of oral testimony, much of which was by expert witnesses. The findings of the trial court made upon conflicting oral evidence are conclusive upon this court. (*Beaubien v. Hindman*, 37 Kan. 227, 15 Pac. 184; *Giffen v. Johnson*, 43 Kan. 678, 23 Pac. 954; *Jones v. Bank*, 66 Kan. 808, 72 Pac. 391; *Leverton v. Rork*, 74 Kan. 832, 85 Pac. 800; *Stone v. Townsend*, 80 Kan. 697, 103 Pac. 114; *Love v. Love*, 72 Kan. 658, 83 Pac. 201; *Taylor v. Adams*, 79 Kan. 360, 99 Pac. 597.)

It is only fair to counsel for defendant to say that this proposition is not controverted. The defendant, however, attempts in a measure to discredit the findings of fact because the court did not agree with the witnesses on either side in determining the quantity of gas taken from the wells; but that fact can not be urged against the conclusiveness of the findings. It was the province of the court to consider all the evidence and

arrive at what it deemed a just verdict. (*Missouri River R. R. Co. v. Richards,* 8 Kan. 101; *Craver v. Hornburg,* 26 Kan. 94; *Young v. Irwin,* 70 Kan. 796, 79 Pac. 678.)

The real contention of the defendant is, that the court adopted erroneous rules for measuring the damages, and that the findings as to some material facts are so contrary to certain well-known physical facts as to require another trial.

The six wells involved are said to be among the largest gas wells ever brought in in the Kansas field. Well No. 1 struck gas December 1, 1906, and was later drilled 28 feet deeper; its capacity was 30,000,000 cubic feet per day, and the rock pressure 290 pounds. Well No. 2 was brought in December 20, 1906, with a capacity of 20,000,000 cubic feet. Well No. 3 was brought in January 17, 1907; it was drilled deeper November 16, 1907, when its capacity was found to be 35,500,000 cubic feet. Well No. 4, drilled in June 1907, had a capacity of 20,-000,000 cubic feet. Wells Nos. 5 and 6 were respectively brought in during November and December, 1907, and each showed 37,000,000 cubic feet capacity.

From the nature of the case, the plaintiff obviously had no means of ascertaining what the product of the wells had amounted to, or the price realized therefor, and was obliged to rely largely upon such information as might be obtained from the company itself. In its answer, the company denied that he had any interest in the land; and it made no offer to disclose the facts respecting the quantity of gas taken, the cost of marketing, or the gross or net proceeds thereof. The plaintiff took the deposition of Mr. Mackey, an attorney and one of the managing officers of the Kansas Natural Gas Company, at its office in Pittsburg, Pa. The witness stated that there were no books or records of the company there which showed the product of the wells in question or the price received for gas taken therefrom; that all such books and papers were kept at the com-

Johnson v. Gas Co.

pany's office at Independence, Kan. Subsequently, plaintiff sought to take the depositions of the general manager and the auditor of the company at Independence. The general manager was served with process requiring the production of the books and records, but they were not produced and the witnesses refused to testify. The plaintiff thereupon obtained from the court an order for the inspection of the books of the company, and had such books and records as were furnished him inspected by Mr. LaDow, an expert gas engineer, and also by an expert accountant. Although the defendant company has four pipe lines, the gas taken from the Johnson wells was all marketed through what are known as the Kansas City Sixteen Inch Trunk and the Northern Trunk Lines. The defendant bore no part of the expense of distributing gas to consumers. In December, 1910, under an order of court, a meter was installed upon the premises, and it was placed under the supervision of a receiver appointed by the court. The main witness by whom the plaintiff sought to show the quantity of gas taken was Mr. La-Dow, a graduate engineer, who qualified as an expert, having had occasion in his business to estimate the product and flow of gas wells. He testified that the tables contained in the Metric Metal Book, published by a company at Erie, Pa., are generally recognized as authority on that subject. His testimony was based upon the open flow capacity of the wells, and their minute pressure as shown him by the records kept by the defendant. He had likewise examined the meter charts showing the flow through the meter after it was installed. In arriving at his estimate, he testified that he considered all the data furnished him respecting the wells on the Johnson farm, including the rock pressure, which it is shown had decreased from 290 pounds in some instances to less than 100 pounds during the operation of the wells from the time they were brought in until the time of the trial. His testimony is that all

the wells he had examined showed an open flow capacity far in excess of that shown by the minute pressure records, and that the latter is usually from one-half to one-third less than the open flow; that, using the tables of the catalogue of the Metric Metal Works, which it is conceded is everywhere recognized as authority, he made an estimate of the possible capacity of the wells based upon all the information gained from the records and history of the wells, their initial capacity, the size and capacity of the lines to which they were connected, the variation in the rock pressure during the period; and that in his opinion the amount taken was close to one-third of the total capacity.

The claim that the finding as to the quantity of gas taken involves a physical impossibility is based upon Boyle's well known law that the volume of a gas varies inversely as the force of compression, the temperature remaining constant. The contention is that the court relied upon estimates which absolutely ignored this rule. We do not think the record sustains the contention. The witness, Mr. LaDow, testified that the pressure in the main line would certainly affect the quantity of gas that could be delivered; that he had checked up the line pressure and had taken it into consideration in making his estimates; that one method of estimating the quantity is to take one-third of the possible capacity, and the book of the Metric Metal Works, which both plaintiff and defendant accepted as authority, seems to sustain the witness, and to recognize the open flow capacity as a proper basis for such estimates.

There is much force in the plaintiff's contention that the defendant is not in position to complain of the method employed in arriving at the estimate for the reason that it failed to produce all the records and history of each well, and that it was incumbent upon it to do this and to furnish every other means in its power to aid the court in ascertaining the truth.

The chief engineer of the company testified that the company could have shown the product of every well connected with these two trunk lines; and the general auditor admitted that the company had a record of every well operated from 1906 to the time of the trial. No similar records of other wells connected with the trunk lines in question were produced. The defendant makes the claim that the court's figures are necessarily wrong because the result reached shows more gas taken from the Johnson wells than from the Hanson lease of adjoining lands. The Hanson lease required the defendant to pay to the lessors a stipulated price per thousand cubic feet as measured by meter. Under the more favorable terms of the Johnson lease the defendant paid an annual rental of $200 on each well, and, as plaintiff claims, the natural inference is that, since the wells on both leases were drawing from the same pool, the defendant would not intentionally take the greater quantity from wells where it would be obliged to pay in proportion to the amount taken, but on the contrary would exhaust the product of the Johnson wells as rapidly as possible. The court could and doubtless did consider all inferences and presumptions which were naturally to be drawn from the evidence.

Both sides concede the rule that the measure of damages is the value of the gas at the time and place of conversion, and that this would be the amount the gas sold for, less reasonable expenses for marketing the same. The defendant, however, claims that the court should have considered the amount which it claimed to have paid the pipe-line company as rental. The evidence shows that the defendant owns what is doubtless a controlling interest in an underlying company which nominally owns the trunk lines through which the gas was transported to market. It offered testimony tending to show the cost of the pipe lines, interest thereon, and the cost of maintenance, and the cost of sinking new wells, including dry ones, the cost

of operation, including such items as salaries of officers, attorneys' fees, damages paid for injuries to employees, investments in office buildings at Pittsburg, Pa., and a vast number of items which it is claimed the court should have considered in estimating the cost of marketing the gas.

We think the plaintiff's contention is sound, and that if this involved an accounting of ores, and the defendant had owned or operated a railroad over which the ores were transported to market, it could only charge the plaintiff with the reasonable cost of such transportation, which could not be shown by proof of the original cost of the road, the expense of maintenance and operation, the amounts placed in sinking funds or invested in outside speculations. In view of the importance of the case we deem it proper to quote at length the explanatory statement of the trial court setting forth the grounds upon which the court reached its conclusions. It was filed as part of the opinion at the time the judgment was rendered. It follows:

"EXPLANATORY STATEMENT.

"In this case, involving as it does an intricate array of figures and large interests, it is important that the parties interested should know how the court arrived at the results as expressed in the judgment rendered. It is therefore my purpose to set forth as briefly as possible the calculations made and the reasons for adopting them.

"All questions as to Axel Johnson's right to a recovery in the case are settled in his favor, so all of these are passed over without discussion. Therefore the first question to engage attention is, What was the quantity of gas taken by the defendant, Kansas Natural Gas Company, from the S. W. Quarter of Sec. 33, Twp. 27, Range 17, Wilson county, Kansas, from Dec. 1906, to April 1st, 1912? According to the calculations of the plaintiff to this action there was 15,910,182,000 cu. ft. of gas taken, measured at the standard pressure of 4 oz. Taking the calculations of the defendant gas company, there was 1,902,287,000 cu. ft. of gas taken, measured at the same pressure. It is a very wide dis-

crepancy indeed, and deserves to be carefully inquired after.

"I know of no rule or reason why a court should not call to its assistance, the same as a jury, its general knowledge and information relating to the subject of investigation. That I have endeavored to do in this case, and have examined in the light of it all the evidence.

"By the figures of the plaintiff, taken from the evidence of Mr. LaDow, and which were estimates based on the initial capacity or volume of the wells, there was 9,382,067,000 cu. ft. of gas taken in the year 1908, while in the year 1909 his calculations, based on minute pressures, shows 890,710,000 cu. ft. of gas taken that year, which is less than one-tenth the quantity taken the previous year. Exhibits R, S, T, U, V and W do not show such a decline in rock pressure as will warrant a belief that there was such a vast difference in the quantity of gas taken for those two years. But I think we may rely with comfortable security on the amount shown to be taken in the year 1909, and which was calculated upon minute pressures, for this is quite a general method of making measurements in gas districts, and is recognized as being reasonably correct and accurate.

"As a further demonstration that plaintiff's figures as to the quantity of gas taken are too high, I have reduced a quarter section to sq. ft. and find it to contain 6,969,600 sq. ft. and that I find is contained in 15,910,182,000 the following number of times, namely, 2284.65, which would indicate a stratum of gas 2284.65 ft. in thickness underlying the whole quarter section of the Johnson land when measured at 4 oz. pressure. But as shown by exhibits R, S, T, U, V and W, this gas stratum when first tapped had a pressure of approximately 280 lbs., therefore I have divided 2284.65 by 20.43, which is the proper multiple for reducing 280-lb. gas to 4 oz. pressure. (See table on page 47 of Metric Metal Works and marked Exhibit 7. This multiple I have verified by the formula found on pages 63 and 64 of the same work.) By dividing as above stated I find that the volume taken under plaintiff's estimate would equal a stratum of gas 111.3 ft. in thickness at a 280-lb. pressure under the entire quarter section. It is very doubtful whether the stratum of gas sand under the Johnson land is 111.3 ft. in thickness. As shown by

exhibits R, S, T, U, V and W, none of the wells on the Johnson land were drilled into the gas sand deeper than 56 ft. I am not sure that I have ever known of a gas sand in this field that was more than 80 ft. in thickness, the average being about 30 ft. Of course it is a fair presumption and doubtless the fact, owing to the migratory character of gas, that a considerable portion of the gas taken out through the Johnson wells came from surrounding territory, but allowing for that I am convinced that plaintiff's estimates are entirely too high.

"Turning now to the defendant Gas Company's figures and applying the same process of calculation to the 1,902,284,000 cu. ft. of gas taken by it, as defendant's Manager, Mr. Macbeth, and its Engineer, Mr. Welch, calculates it has taken. I find that this quantity of gas would make a stratum 14 ft. in thickness at 280 lbs. pressure under the entire Johnson quarter. In my judgment this is not equal to the quantity of gas taken by the defendant Gas Company. I have therefore attempted some calculations of my own, based upon the evidence in this case, and I have reached a result that I deem much nearer the true quantity of gas taken by the defendant Gas Company than either plaintiff's or defendant's calculations.

"The evidence in this case shows that in the year 1909, according to minute pressure calculations, there was 890,710,000 cu. ft. of gas taken from the Johnson wells, and for the first 10 months of the year 1910 there was taken 437,012,000 cu. ft. of gas. After November 1, 1910, the gas from the Johnson wells was measured by meter. Comparing the 10 months of the year 1910 to the year 1909, shows there was a decline of 42.25% in the volume of gas taken. Referring then to Exhibits 1, 2 and 3, which are curves showing the decline in rock pressure with lapse of time on wells numbered 1, 2, and 6, respectively. These curves show that the decline in pressure was quite regular, practically uniform from the drilling of the wells down to the time the meter was put on, November 1, 1910. By an examination of Exhibits R, S, T, U, V, and W, it will be seen that if curves had been prepared as to wells numbered 3, 4, and 5, being all the remaining wells on the Johnson land, that they would have shown the same regular and uniform decline in rock pressure with lapse of time as do wells 1, 2 and 6. Hence, I conclude

that since the rock pressure decline is so nearly uniform from the time of drilling in the wells down to the time that the meter was installed, and since the volume declined 42.25%, comparing the 10 months of 1910 to the year 1909, that the same percentage of decline in volume may be calculated between 1909 and 1908, and so on back to January 1, 1907. Upon this basis of calculating, I find there was produced through the Johnson wells the total of 4,570,604,000 cu. ft. of gas.

"Let us see how nearly these figures may be verified. Calling attention to the 'Statement of Gas Purchased,' which has been offered in evidence in this case and is marked Exhibits 14 to 22, inclusive, I find among those from whom gas has been purchased, J. S. Young, and the lease from which the purchased gas is taken is designated 'Hanson' in the report. Aside from the record in this case, I happen to know that the Hanson lease joins the Johnson lease, and it is matter of common knowledge in and about Chanute, Kan., that this lease, next perhaps to the Johnson lease, was the largest producer in the west Chanute field. This lease was a 320-acre tract. The exhibits marked 14 to 20 disclose the fact that J. S. Young was paid $113,447.77 for gas produced on the Hanson lease, and the report shows that this sum was derived from gas sold at $0.0175 per thousand cu. ft., which would be approximately 6 billion cu. ft. of gas sold. The exhibits in this case do not show all the gas that has been taken from the Hanson lease. I have been reliably informed that there was approximately $140,000 worth of gas sold from this lease at the price before stated, which shows that there was 8 billion cu. ft. of gas taken from that lease, or an average of .4 billion to the quarter section. I am not informed whether each quarter of the Hanson lease was equally productive, but assuming that they were, it is apparent the calculations made by the court are not very largely above nor materially below the true quantity of gas taken from the Johnson lease.

"The second question to engage attention is, What is the net sum per 1000 cubic feet the defendant gas company received for the gas sold from the Johnson land?

"The evidence discloses that the total quantity of gas sold through the K. C. 16″ line and the Northern Trunk—and these were the lines that received all the

37—90 KAN.

gas from the Johnson lease—was 94,777,575,000 cubic feet of gas. The evidence also discloses that the gross sum received for that quantity of gas was $13,419,072.29. From this gross amount there are, however, some legitimate deductions to be made. It is shown that the operating expense of the two lines during the period when the gas was taken was $1,307,525.93. It is also shown that other general operating expenses not included in the foregoing item and amounting to $699,486.84 was paid out upon these same lines. These two items aggregate $2,007,012.77 and should be taken from the gross receipts for sale of gas. There is a further item for rentals on pipe lines amounting to $3,810,118.07 for which defendant contends. It is true that the fair rental value of the pipe lines for the time used should be taken out of the gross receipts for sale of gas, providing that item can be fairly ascertained from the evidence. The rental of the pipe lines as contended for by the gas company does not appear to be based upon any evidence that the sums paid yearly as rental was the fair and reasonable value for the use of the lines for the time they were used. And such a charge as represents the fair and reasonable value for the use of the lines, seems to me to be the only one for which the plaintiff in this action may be rightly called upon to bear his ratable share. For example, the evidence discloses that the rental on pipe lines for December, 1906, was $12,197.12, which is at the approximate annual rate of $150,000.00. For the year 1907 the rental was $449,342.18 and in 1908 $844,574.66. It must be apparent to all that these variable charges are not based upon any value fixed for the use of the pipe lines. The evidence does show, however, that large sums of this money paid as rental went into stocks and securities of the underlying companies; into sinking funds to pay interest on the bonded indebtedness of the pipe-line companies, and to redeem bonds as they fell due which were given in payment of the original cost of construction of the pipe lines. Equity will not, I think, place any of these burdens upon the plaintiff. I have been unable to hit upon any method whereby I could ascertain the sum that is fairly chargeable as rental for the use of the pipe lines, therefore I have been obliged to leave it all out of my calculations. My conclusion is that taking the sum of $2,007,012.93 from the gross

sum of $13,419,072.29, and dividing the net result by 94,777,575 it will give the net selling price of plaintiff's gas which I find to be $.1204 per thousand cubic feet. The total value of plaintiff's share of the gas taken from the Johnson land I find to be $45,858.47, but from this sum one-twelfth of the total cost of drilling and equipping the wells is to be deducted. The evidence shows $1500.00 to be a fair price for drilling and equipping a gas well, as these wells were equipped. There being six wells I find that plaintiff's just share in this expense to be $750, and that plaintiff should have judgment for the sum of $45,108.47, and his costs in this action."

The plaintiff claims that the amount of the judgment is far less than the evidence warranted; and it appears from the explanatory statement that the court's estimate of the quantity of gas taken is much lower than that of the witness Mr. LaDow. It will also be observed that the court accepted the figures of the defendant in allowing it credit for the cost of transportation, although by no means all the credits claimed by defendant were allowed. In view of defendant's failure to offer by some other method to show the reasonable cost of transporting the gas to market, we think the court rightly held that the only charge for which the plaintiff could be called upon to pay his ratable share was the fair and reasonable value of the use of the pipe lines; and further, that the court was right when in the explanatory statement it was said:

"The rental of the pipe lines as contended for by the Gas Company does not appear to be based upon any evidence that the sums paid yearly as rental was the fair and reasonable value for the use of the lines for the time they were used."

From the statement explaining the method employed to reconcile, as far as possible, the sharp conflict in the testimony of the experts and the wide variance in the claims of the parties it is apparent that the learned trial judge very properly drew to his aid his own knowledge and information of the history and conditions of the gas field where these wells are located, and in the

light of his general information, gained from experience and observation in such matters, considered carefully all the evidence on both sides. Under the circumstances, the method adopted appears to have been the only available one to ascertain as fairly as possible the approximate quantity and the reasonable value of the gas at the time and place it was appropriated, and the findings will not be disturbed. The plaintiff made a *prima facie* showing of the quantity and the reasonable value of the gas taken. The defendant was presumed, from the nature of the transaction, to have in its possession records and books which would show at least approximately what the facts were. That it failed to produce all the information in its possession and control appears to be established by the evidence. In similar cases, where the proof is peculiarly within the knowledge and control of the wrongdoer, it has been held that the burden is on him to reduce the amount of the recovery by showing the extent of his wrong. (*Mouat v. Wood,* 4 Colo. App. 118, 35 Pac. 58; *St. Clair v. Mining & Milling Co.,* 9 Colo. App. 235, 47 Pac. 466.) And in suits for accounting generally, the rule is that the defendant has the burden of proving what allowances he is entitled to. (*Thatcher v. Hayes,* 54 Mich. 184, 19 N. W. 946; *Dettering v. Nordstrom,* 148 Fed. 81.)

In a quite similar case (*Great Southern G. & O. Co. v. Logan Natural G. & F. Co.,* 155 Fed. 114), the defendants took and marketed the gas until the well was exhausted. The gas from the well was conducted through a pipe line, together with the gas from some 60 wells owned by the defendant, and "no serious effort was made to measure the contribution of this well to the pipe line." (p. 115.) The trial court, after setting aside the report of the master appointed to take an account, fixed the value of the gas at $10,000, that being the estimated market value in that field of a gas well of approximate capacity. The reviewing court modified the decree and allowed the plaintiff the sum of

$16,730.21, that being the aliquot part of the gross product of the sixty wells. In the opinion it was said:

"Having taken no step by which it can account for the property of plaintiff, it must submit to every inconvenience in ascertaining that compensation and all reasonable doubts which arise in that accounting. (*Wetherbee v. Green,* 22 Mich. 311, 7 Am. Rep. 653.) The reasonable market value of a gas well does not, under the peculiar circumstances, compensate plaintiff. That would. be to give it only the value of the gas in the ground. That might be adequate but for the fact that plaintiff had its own pipe line, and could therefore market gas from this well with little addition to the cost of conducting its business.

"This well is also shown to have been a larger producer than the average well in this field. It also appears that all of the wells contributing to defendant's pipe line did not contribute during the entire life of this well, and, further, that the appellant was obliged to buy gas of appellee to meet its own requirements. In view of all the facts, we conclude that an aliquot part of the gross product of sixty wells will not be an unjust compensation. Cooley on Torts, 53; Sutherland on Damages, § 101; *Moore v. Bowman,* 47 N. H. 494, 500." (p. 115.)

We think the trial court was right in holding that the plaintiff can not be charged with the burden of paying any part of the large sums expended in the purchase of the stocks and securities of the underlying companies, in sinking funds to redeem bonds issued in payment of the original cost of the construction of the pipe lines, or for drilling new wells for the defendant; and further, that in a case like the present, evidence of such payments is not the proper way to establish the fair and reasonable rental value of the use of such pipe lines for marketing the gas in controversy.

One other matter remains to be considered. Upon the motion of defendant gas company, the widow and the other heirs of John A. Johnson were made defendants, and the gas company filed a cross-petition against them asking judgment for a· breach of covenant of

title. The court awarded the codefendants judgment for costs, from which the company appeals. In the lease of the premises to the company the names of the lessors are stated, followed by the recital: "the same being all the heirs at law of J. A. Johnson, deceased." The instrument was prepared by an agent or attorney of the company. Selma Johnson, who at that time resided on the farm, and two of the children whose ages are not shown, first signed the lease. Selma Johnson can not read or write the English language and speaks it poorly. Esther Rowley, another heir, signed the lease with her husband at the office of the attorney for the company, and it was later signed by other nonresident heirs. Esther Rowley testified that she informed the agent of the company before the lease was executed that there were seven children in the family.

The consideration for the lease was one dollar; and although it provided for the payment of an annual rental of $600 until more than four gas wells were drilled on the premises, and $200 yearly for each well drilled and used after the first four, it was also stipulated that the company might surrender the lease at any time on payment of $5. At the time of the trial $6600 had been received for rentals for the six years. The lease was for ten years and as much longer as oil and gas should be found in paying quantities. The court made a general finding in favor of the other heirs upon the issues raised by the cross-petition and their answer thereto. We think the judgment is sustained by the evidence.

The judgment in plaintiff's favor as well as the judgment for costs in favor of the other heirs will be affirmed.

*W. P. Hackney,* and *J. T. Lafferty,* both of Winfield, for the appellant.

*A. M. Jackson,* and *A. L. Noble,* both of Winfield, for the appellee.