No. 35,774

R. B. MOLTER, FRANK F. MOLTER and SAM MOLTER, *Appellees*, v. JOHN LEWIS, GLEN LEWIS, HARRY LEWIS and PAGE LEWIS, *Appellants*.

(134 P. 2d 404)

Opinion filed March 6, 1943.

*L. J. Bond,* of El Dorado, was on the briefs for the appellants.

*Harold G. Forbes* and *Thos. C. Forbes,* both of Eureka, were on the briefs for the appellees.

The opinion of the court was delivered by

HARVEY, J.: This was an action for a money judgment by the owners of an oil and gas leasehold against the owners of the land for transportation charges for transporting the landowners' one-eighth share of the oil to a pipe line connection through which the oil was marketed. A trial by the court resulted in judgment for plaintiffs. Defendants have appealed. We shall speak of the parties as they appeared in the court below.

The record discloses that on January 31, 1933, Granville R. Lewis and wife, the owners of certain land in Greenwood county, executed to Harry Corbin an oil and gas lease thereon, which was in the form commonly referred to as 88B, for use in this state. The lease contained the following provision pertinent to the action.

"In consideration of the premises the said lessee covenants and agrees: 1st. To deliver to the credit of lessor, free of cost, in the pipe line to which he may connect his wells, the equal one-eighth part of all oil produced and saved from the leased premises. . . ."

By assignment plaintiffs became the owners of this lease and by inheritance defendants became the owners of the land. By September 1, 1938, plaintiff had drilled a producing well on the land. Another was drilled later. At the time the lease was executed there was no pipe line connection to the leasehold, and none was obtained prior to November 1, 1941. Between September 1, 1938, and January 15, 1941, there was produced from the leasehold 27,545.26 barrels of oil, of which one-eighth, 3,443.15 barrels, belonged to the defendants as the owners of the royalty interest in the lease. Plaintiffs transported all of the oil produced, including that belonging to defendants, to the National Refining Company at El Dorado by truck, and the reasonable charge for transporting defendants' share of the oil was $516.47. Between January 15 and November 15, 1941, plaintiffs produced and saved from the lease 23,107.71 barrels of oil, of which one-eighth thereof, or 3,888.46 barrels, belonged to defendants as the owners of the royalty interest. Plaintiffs transported all of the oil, including that portion belonging to defendants, by truck to the Socony Vacuum Pumping Station, and the reasonable charge for transporting the oil belonging to defendants was $361.60. There is no controversy about these matters and the charge is conceded to be reasonable if plaintiffs are entitled to recovery. The court among other things found:

"5. At the time of the execution of said oil and gas lease the lessors and the lessee, and thereafter their various assignees, including these plaintiffs and these defendants, knew that there were no pipeline connections in said field, even though said oil and gas lease provided that the lessor was to receive free of cost in the pipeline to which the wells might be connected, an equal one-eighth part of all oil produced and saved from said premises.

"6. The plaintiffs made an effort to procure pipeline connections and were promised a pipeline connection when a daily production of seventy-five barrels of oil could be obtained from said lease, but no pipeline connections were ever obtained prior to the 15th day of November, 1941.

"7. That demand was made by the plaintiffs upon the defendants for the amount claimed due to them for the transportation of said oil owned by the defendants.

"8. That there was no market for said oil on said lease by reason of the plaintiffs being unable to procure pipeline connections, and in order to obtain a market it was necessary to transport by truck the oil produced from said lease."

The court further found defendants were indebted to plaintiffs in the sum of $877.53, with interest at six percent, since November 15, 1941, and rendered judgment accordingly.

To sustain the judgment of the trial court plaintiffs cite two cases, *Scott v. Steinberger*, 113 Kan. 67, 213 Pac. 645, and *Voshell v. Indian Territory Illuminating Oil Co.*, 137 Kan. 160, 19 P. 2d 456. Defendants seek to distinguish these cases and make other arguments which will be noted later. In the Scott case the syllabus reads:

"In an action to recover the lessor's share of gas obtained from his land under the following provision of the lease, namely:

"'Party of the second part shall deliver to the credit of party of the first part free of cost in the pipe lines to which he may connect his wells one-eighth of all oil produced and saved on said premises, and shall pay the market price for same in cash if party of the first part shall so desire; and shall pay to party of the first part one-eighth of all gas produced and marketed.'

"It is held that the lessor was entitled to receive his share as measured into a pipe line which connected with the wells at the price or value of gas at that place and not the price or value that was obtained for it at some distant place on the pipe line to which it was transported and sold."

There the land was situated in Montgomery county. Several wells producing gas were drilled on the leased premises. There was no pipe line near for the marketing of this gas. The lessees built a pipe line, at a cost of $61,680, from the leased premises to Crow Hill and Neodesha, where they found a market for it, at fifteen cents per thousand cubic feet. The trial court found (See Vol. 2 of Briefs, 113 Kan., in State Library) that eight cents per thousand cubic feet for gas in the north Montgomery county field was a reasonable value on the premises where the gas was produced, and that a reasonable transportation charge for transporting the gas from the lease to Crow Hill and Neodesha was seven cents per thousand cubic feet. The court (page 69) relied on *Johnson v. Gas Co.*, 90 Kan. 565, 135 Pac. 580, an accounting case, in which the reasonable value of the gas taken was in issue, where it was held that the measure of damages for the taking was the fair and reasonable value of the gas at the time and place at which it was taken, and declined to follow, as not convincing, *Barton et al. v. Laclede Oil & Mining Co.*, 27 Okla. 416, 112 Pac. 965, where a different conclusion was reached in view of the terms of the lease in question.

The Scott case has been followed in: *Kretni Development Co. v. Consolidated Oil Corp*, 74 F. 2d 497, 500; *Wall v. United Gas Public Service Co.*, 178 La. 908, 152 So. 561, and accords with the holding in *Rains v. Kentucky Oil Co.*, 200 Ky. 480, 255 S. W. 121. It was distinguished in *Ladd v. Upham*, 58 S. W. 2d 1037, affirmed on appeal, 128 Tex. 14, 95 S. W. 2d 365, where the lease provided the les-

sor should have a fractional share "of the proceeds from the sale of gas" from the leased premises.

See, also, *United States v. Stanolind Crude Oil Purchasing Co.*, 113 F. 2d 194, where is pointed out (p. 198) the distinction between a lease by which the lessor has as his own property a fractional share of the oil produced, and those leases by which the lessor receives a stated share of the "proceeds" of all oil produced.

In the Voshell case plaintiff had a share of the royalty from oil wells on a forty-acre tract of land situated in a large oil pool where there were as many as a hundred producing wells. Several oil companies had pipe lines from some of the wells in the pool. One of them had its lines connected with the forty-acre tract. In December, 1930, there was a depression in the oil business to the extent that the pipe line companies ceased to take oil from any wells except those in which they had a financial interest or special contracts, and the pipe line company which had been taking oil from the forty-acre tract in question ceased taking oil from that tract. There was no general market for oil in the area. Defendant, operating the forty-acre tract, deeming it essential to keep the wells going so they would not be destroyed and because of offset wells, made a special arrangement to have the oil piped to El Dorado, where it could be sold to the El Dorado Refining Company at the price that company was paying locally for oil delivered to its tanks. It was held that plaintiff was entitled to the price received for his share of the oil at El Dorado less the pipe line charges incurred by defendant in having it transported there.

Counsel for defendants, as appellants in this court, contends that the Scott and Voshell cases—particularly the latter—were improperly decided, and in any event that they can be distinguished on the facts from the case at bar. While there are differences in facts we think the legal principle applied in those cases is applicable here. We think, also, that the cases were correctly decided.

Under an oil and gas lease such as we have here the proper development of the leased premises by the lessee places upon him the duty, among other things, of marketing the oil produced. (24 Am. Jur. 571, and authorities there cited.) This is sometimes spoken of as an implied covenant of the lessee of the lease. This is a covenant that the lessee should perform with the diligence of a prudent operator. There is no difficulty about that when the lessee can get pipe lines extended to the wells on the leasehold. In this case the trial

court found plaintiffs had endeavored to get pipe lines extended to the wells on the lease in question, but were unable to do so until in November, 1941. In the meantime there was production which had to be taken care of. It is the duty of the lessee to see that the oil is marketed, but this general duty does not mean that the lessee must pay the transportation charge of the lessee's share of the oil from the well to some distant place. His contract is to deliver the oil to the lessor at the well. Merrill on Covenants Implied in Oil and Gas Leases (2d ed., § 86), treats the matter thus:

"*Place of Sale:* Ordinarily, the product is marketed from the lease, and the lessee's duty is merely to arrange for sale there. But suppose the lessee carries the product to a distant point for sale, either for his own convenience or because there is no market at the field? He may be under no duty to seek a market elsewhere, but if he does, upon what basis must he account? There are three possible solutions: 1. He must account for the price received with no allowance for the transportation to the market. 2. He must account for the price received, less the reasonable cost of transportation from the lease to the market. 3. He may purchase the product for his own account at the lease, or treat it as though it were so purchased, at a price representing its fair value there, and may keep for himself whatever profit results from the enhanced price at the outlet in excess of transportation cost. For the first, there is no authority, and it seems impossible to conceive of any arguments in its favor. The transportation to the distant point is no part of the legitimate operating expense of the lease. For both the second and the third solutions authority is to be found. Upon principle, the second seems preferable. If there is no market value in the field, establishment of a fair value by anything other than value at the point of disposition less the cost of transportation can rest only on speculation. . . ."

In Mills and Willingham, Law of Oil and Gas, it is said:

"§ 129. *Covenant to Deliver to the Pipe Line.* This provision, as has been noted, covers oil produced and saved. . . . This covenant is held to carry with it a duty to treat the oil or gas and put it in marketable condition for delivery to the pipe line. (Citing *Hamilton v. Gas and Fuel Co.,* 117 Kan. 25, 230 Pac. 91.) . . .

"§ 130. *Covenant to Deliver to Pipe Line—Duty to Market.* Closely analogous to the duties of the lessee as outlined in the preceding section is the alleged duty to market. Oil may be produced at a point remote from a pipe line. By reason of difference in gravity it may not be acceptable to a pipe line otherwise available. . . . Is the lessee bound to market? If so, at whose expense? The implied duty to operate is said to include the duty to market. But this is a matter of reasonable diligence and does not touch the question of expense. . . . It has been held, however, that the lessor is entitled only to his oil or gas or the value thereof at the well and not at some distant market. (Citing *Johnson v. Gas Co.,* 90 Kan. 565, 135 Pac. 589; *Scott v. Steinberger,* 113 Kan. 67, 213 Pac. 646, and other cases.) So, if the lessee constructs

a pipe line or deals with another to do so, he is entitled to charge against the lessor his proportion of the reasonable rental value of such line. The lessor, however, is not liable for the cost of such line. Where the lessee undertakes to and does market his own oil or gas by pipe line or tank car it would seem that he would be bound to take the royalty share along with his own, but is only liable for the reasonable value of the royalty share at the well."

In Summers, Oil and Gas (Perm. ed.), it is said:

"§ 400. *Implied Covenant to Market Oil or Gas Produced.* In some leases there will be found an expres covenant on part of the lessee to market the oil and gas produced. (Citing *Gas Co. v. Jones*, 75 Kan. 18, 88 Pac. 537.) The necessity of such a duty is obvious in order that the lessor may receive the consideration for the lease, that is, the royalties which are to be paid when the oil or gas is delivered into a pipe line. In the absence of such a duty, the courts, on the same theory that they imply covenants to test and develop, imply a covenant on part of the lessee to market the oil and gas produced. (Citing *Howarton v. Gas Co.*, 81 Kan. 553, 106 Pac. 47; *Collins v. Oil & Gas Co.*, 85 Kan. 483, 118 Pac. 54, and other cases.) It would be of little benefit to the lessor to have express or implied covenants on part of the lessee to test, develop, and protect the land by drilling wells, if the lessee might cap them and refuse to market the product.

"§ 589. . . . Where leases provide for the payment of one-eighth royalty, the value of one-eighth of the gas, or the market value thereof, most courts hold that the lessor's royalty should be computed upon the basis of the market value of the gas in the field; if such market value actually exists, and if it does not, upon the basis of the reasonable value of such gas as established by competent evidence. (Citing *Scott v. Steinberger*, 113 Kan. 67, 213 Pac. 646, and other cases.)

"§ 590. . . . A lease may merely provide for a delivery of one-eighth or other share of the oil to the credit of the lessor in the pipe line to which the lessee connects his wells. . . .

"It is quite uniformly held in cases involving the marketing of gas that the lessor or royalty owner must bear the expense of transportation of his royalty gas to the point at which it is actually sold (citing *Scott v. Steinberger*, 113 Kan. 67, 213 Pac. 646), and following this line of cases it has been held that where there was no market for oil in the field and the lessee transported the oil to a distant refinery by pipe line, the lessor must bear his portion of the expense of transportation. (Citing *Voshell v. Indian Territory Illuminating Oil Co.*, 137 Kan. 160, 19 P. 2d 456.)

The opinion in the Voshell case was published in the Mid-continent Bulletin and cited by the Texas Court of Civil Appeals in *Corrigan v. Shell Petroleum Corporation*, 62 S. W. 2d 663. The textbook authorities above quoted cite cases from other jurisdictions in harmony with our cases and with the text. See, also, *Hemler v. Union Producing Co.*, 40 Fed. Supp. 824; *Sartor v. Arkansas Natural Gas Corporation*, 46 Fed. Supp. 111, and *Haynes v. Southwest Nat-*

*ural Gas Co.,* 123 F. 2d 1011. We have not attempted to cite all the cases bearing on the question before us. They are collected in the annotation in 86 A. L. R. 725, and later ones in the A. L. R. Blue Book. They are also collected in the American Digest, under Mines and Minerals, Key No. 79 (3).

Counsel for appellants contend the operative interpretation by the parties should be taken into account. Some of the cases do so. Here, the trial court made no finding on that point and the record does not show that it was requested to do so; hence, we are in no position to pass upon it. There is also a suggestion that plaintiffs delayed getting a pipe line to the wells to avoid restriction of production by proration orders. If that is true perhaps it was as beneficial to defendants as it was to plaintiffs. At any rate the trial court's finding No. 6 is contrary to that view, and there appears to have been no motion by defendants to set aside or to modify that finding.

We find no error in the record. The judgment of the trial court is affirmed.